IN THE MATTER OF: SUSAN LYNN FARROW, RESPONDENT

No. 789DC1142

(Filed 19 June 1979)

1. **Evidence § 14; Insane Persons § 1.2— physician-patient privilege—inapplicability to involuntary commitment proceedings**

   The physician-patient privilege created by G.S. 8-53 is not applicable in involuntary commitment proceedings conducted pursuant to Article 5A of G.S. Ch. 122; therefore, that statute did not prohibit the magistrate, in entering a temporary custody order, from considering information contained in a doctor's affidavit relating to matters which had been orally communicated to the doctor by respondent while she was his patient and relating to knowledge obtained by him as a result of his examinations of the respondent while he attended her in a professional capacity.

2. **Insane Persons § 1.2— involuntary commitment of person admitted voluntarily**

   A patient voluntarily admitted to a mental health care facility under G.S. 122-56.1 *et seq.* may not be ordered held involuntarily under G.S. 122-58.1 *et seq.* absent evidence sufficient to support a conclusion that it is reasonably necessary for the effective treatment and safety of the patient or for the safety of others to do so.

APPEAL by respondent from *Wilkinson, Judge*. Judgment entered 24 August 1978 in District Court, GRANVILLE County. Heard in the Court of Appeals 27 March 1979.

This is an appeal from an involuntary commitment order entered pursuant to G.S. 122-58.8. Facts pertinent to the questions raised are stated in the opinion.

*Attorney General Edmisten by Associate Attorney Christopher S. Crosby for petitioner appellee.*

*Susan Freya Olive for respondent appellant.*

PARKER, Judge.

This proceeding was commenced 14 August 1978 when Daniel T. Peak, M.D., a physician at John Umstead Hospital, filed his sworn petition before a magistrate pursuant to G.S. 122-58.3(a) for the involuntary commitment of the respondent. In this petition Dr. Peak alleged that respondent was mentally ill and imminently dangerous to herself or others. As the facts upon which this opinion was based, the petitioner alleged that respondent "[h]ears

In re Farrow

voices which tell her she is no good and should kill herself" and that she "[h]as made 3 suicide attempts in the last 2 weeks." At the time the petition was filed, respondent was already a patient at John Umstead Hospital, having voluntarily admitted herself in May, 1978. Petitioner was her attending physician.

[1] Upon receipt of the petition, the magistrate ordered that respondent be retained at John Umstead Hospital "for temporary custody, examination and treatment pending a district court hearing." When the matter came on for hearing before the district court, the respondent, who was present and represented by counsel, moved to dismiss the proceedings on the grounds that all allegations in the affidavit and petition of Dr. Peak were based on confidential physician-patient communications barred by the provisions of G.S. 8-53 from being disclosed by the physican or from being considered by the magistrate as a basis for issuing the temporary custody order. Respondent contended that the magistrate thus had no evidence properly before him on which to base his custody order and for this reason the proceedings should be dismissed. The district court denied the motion, which ruling is the basis of respondent's first assignment of error.

When Dr. Peak's affidavit was offered in evidence at the hearing, respondent objected to its admission on the grounds that in material part it contained solely privileged information protected from disclosure by G.S. 8-53. [No objection was made, either in the district court or before this court on this appeal, on the grounds that the doctor was not present and subject to cross-examination; see G.S. 122-58.7(e) and *In re Benton*, 26 N.C. App. 294, 215 S.E. 2d 792 (1975)]. Respondent's objection was overruled and the doctor's affidavit was received in evidence, which ruling is the basis of respondent's second assignment of error. Since respondent's first two assignments of error each present the question of the extent of the applicability of G.S. 8-53 in involuntary commitment proceedings, we will discuss them together.

"At common law no privilege was recognized for communications between physician and patient, but North Carolina, in common with a number of other states, has created such a privilege by statute." 1 Stansbury's, N.C. Evidence, Brandis Revision, § 64, p. 200. "It is the purpose of such statutes to induce the patient to make full disclosure that proper treatment may be given, to pre-

vent public disclosure of socially stigmatized diseases, and in some instances to protect patients from self-incrimination." *Sims v. Insurance Co.*, 257 N.C. 32, 36, 125 S.E. 2d 326, 329 (1962). The North Carolina statute creating the privilege is G.S. 8-53, which in its present form, is as follows:

> § 8-53. Communications between physician and patient.— No person, duly authorized to practice physic or surgery, shall be required to disclose any information which he may have acquired in attending a patient in a professional character, and which information was necessary to enable him to prescribe for such patient as a physician; or to do any act for him as a surgeon. Confidential information obtained in medical records shall be furnished only on the authorization of the patient, or if deceased, the executor, administrator, or in the case of unadministered estates, the next of kin; provided, that the court, either at the trial or prior thereto, or the Industrial Commission pursuant to law may compel such disclosure, if in his opinion the same is necessary to a proper administration of justice.

Interpreting G.S. 8-53, our Supreme Court has held that the privilege created by that statute is for the benefit of the patient alone, *Capps v. Lynch*, 253 N.C. 18, 116 S.E. 2d 137 (1960); and "extends, not only to information orally communicated by the patient, but to knowledge obtained by the physician or surgeon through his own observation or examination while attending the patient in a professional capacity, and which was necessary to enable him to prescribe." *Smith v. Lumber Co.*, 147 N.C. 62, 64, 60 S.E. 717, 718 (1908). The privilege may be waived by the patient, *Capps v. Lynch, supra*, and in any event is a qualified, rather than an absolute, privilege in that the judge has discretion, either at the trial or prior thereto, to "compel such disclosure, if in his opinion the same is necessary to a proper administration of justice." G.S. 8-53.

In the present case the information contained in the doctor's affidavit related to matters which had been orally communicated to him by the respondent while she was his patient and to knowledge obtained by him as a result of his examinations of the respondent while he attended her in a professional capacity. It was information necessary to enable him to prescribe and to per-

form professional services for her as his patient. Respondent did not waive the privilege. The doctor's affidavit, therefore, contained information within the scope of the statutory privilege, if G.S. 8-53 is applicable in an involuntary commitment proceeding. We hold that it is not.

Our conclusion that G.S. 8-53 is not applicable in involuntary commitment proceedings conducted pursuant to Article 5A of G.S. Ch. 122 is based upon an analysis both of the purpose of such proceedings and upon the express statutory provisions which govern how that purpose shall be accomplished. The policy of this State concerning involuntary commitments is set forth in the first section of Article 5A of G.S. Ch. 122 as follows:

> G.S. 122-58.1 *Declaration of policy.* It is the policy of this State that no person shall be committed to a mental health facility unless he is mentally ill or an inebriate and imminently dangerous to himself or others, or unless he is mentally retarded and, because of an accompanying behavior disorder, is imminently dangerous to others, that a commitment will be accomplished under conditions that protect the dignity and constitutional rights of the person; and that committed persons will be discharged as soon as a less restrictive mode of treatment is appropriate.

It is manifest from this declaration of policy and from a reading of the entire Article 5A of G.S. Ch. 122 that one of the purposes, indeed the primary purpose, of an involuntary commitment proceeding is to protect the person who, after due process, has been found to be both mentally ill and imminently dangerous by placing such a person in a more protected environment where the danger may be minimized and his treatment facilitated. In a real sense the proceeding is an important step in his medical and psychiatric treatment. That the Legislature intended for his physician to play a key role almost from the inception of the proceedings and that it did not intend this role to be inhibited by G.S. 8-53 is made manifest by a number of express statutory provisions. For example, while G.S. 122-58.3(a) authorizes *any* person who has knowledge of a mentally ill or inebriate person who is imminently dangerous to himself or others to appear before a clerk of court or magistrate to execute an affidavit to this effect and "petition the clerk or magistrate for issuance of an order to

take the respondent into custody for examination by a qualified physician," subsection (d) of the same section provides that if the affiant is himself a qualified physician, he may execute the oath to the affidavit before any official authorized to administer oaths and in such case the physician is not required to appear before the clerk or magistrate for this purpose. Clearly, the Legislature contemplated that a physician who has knowledge of a mentally ill or inebriate person who is imminently dangerous to himself or others should initiate the proceedings for such person's commitment by executing the oath setting forth his knowledge of these facts. In the usual case that knowledge would be obtained by the physician in the course of treating his patient, and it would be anomalous indeed to believe that the Legislature intended that a physician who happened on the knowledge in some other manner should be permitted to execute the affidavit but that the physician who had the surer knowledge derived from observation and treatment of his own patient should be prevented by G.S. 8-53 from doing so. Other sections of Article 5A of G.S. Ch. 122 make even more clear that the Legislature did not contemplate that G.S. 8-53 should apply in involuntary commitment proceedings. G.S. 122-58.6(c) provides that "[p]ending the district court hearing, the qualified physician attending the respondent is authorized to administer to the respondent reasonable and appropriate medication and treatment that is consistent with accepted medical standards." That the Legislature contemplated that such attending physician should be free to testify is shown by G.S. 122-58(7)(e) which expressly provides that "[c]ertified copies of reports and findings of qualified physicians and medical records of the mental health facility are admissible in evidence, but the respondent's right to confront and cross-examine witnesses shall not be denied." It should be noted that the Legislature did not say that there should be admissible in evidence the reports and findings of qualified physicians *other than those who attend and treat the patient* or *other than as prohibited by G.S. 8-53*; instead it made *all* of the reports and findings of qualified physicians and medical records of the mental health facility admissible in evidence at the involuntary commitment hearing provided for in G.S. 122-58.7. Again, G.S. 122-58.11, which deals with rehearings for persons who have been committed, provides in subsection (a) that "if the chief of medical services of the in-patient facility determines that treatment of a respondent beyond the initial period will be

necessary, he shall so notify the clerk of superior court of the county in which the facility is located." In such case the district court judge is to calendar a rehearing at least ten days before the end of the initial period of commitment. Subsection (c) provides that such "[r]ehearings are governed by the same procedures as initial hearings, and the respondent has the same rights he had at the initial hearing. . ." Surely, the Legislature did not intend that at such a rehearing the staff physicians who had been attending and treating the respondent and who of all persons were most knowledgeable and best qualified to testify concerning his need for continued treatment should be barred from testifying. These statutes all clearly imply that the attending physicians are not to be prevented by G.S. 8-53 from testifying at any of the hearings provided for under Article 5A of G.S. Ch. 122. We hold, therefore, that G.S. 8-53 does not apply in involuntary commitment proceedings conducted pursuant to that Article. Respondent's first two assignments of error are overruled.

    For decisions from other jurisdictions holding the physician-patient privilege inapplicable to incompetency or involuntary commitment proceedings, see: In Re Allen, 204 N.Y.S. 2d 876 (1960) [disapproving holding in Matter of Gates, 170 App Div 921, 154 N.Y.S. 782 (1915) and adopting view earlier expressed in Matter of Benson, 16 N.Y.S. 111 (1891)]; Metropolitan Life Ins. Co. v. Ryan, 237 Mo. App. 464, 172 S.W. 2d 269 (1943); for cases contra, see cases cited in Annot., 44 A.L.R. 3d 24, § 34, pp. 155-57. For express statutory solutions to the problem, see Conn. Stat. Ann., § 52, 146f(b) and Mass. Gen. Laws, Ch. 233, Sec. 20B(a); for a general discussion of the problems posed by the inherent conflict between the psychiatrist's duty to maintain confidentiality and his duty to disclose when necessary to protect his patient or the public from imminent danger, see Note, U. Ill. L. Forum (1976) p. 1103; see also Tarasoff v. Regents of University of California, 17 Cal. 3d 425, 131 Cal. Rptr. 14, 551 P2d 334, 83 ALR 3d 1166 (1976).

[2]    At the conclusion of the hearing in the present case, the court entered an order finding respondent to be mentally ill in that she suffered from psychotic depression, imminently dangerous to herself in that she had made three attempts to kill herself in the preceding two weeks, and in need of further hospitalization and treatment. On these findings the court ordered respondent committed to John Umstead Hospital for a

period of 60 days or until discharged according to law. Respondent's third and final assignment of error challenges the entry of this order on the grounds that, since respondent was already a voluntarily admitted in-patient receiving treatment at John Umstead Hospital, and since there was no showing that she would not voluntarily remain at the hospital for as long as proper treatment of her condition might require, there was no sufficient reason for imposing upon her the restraint of an involuntary commitment order. On the facts disclosed by this record, we agree.

Respondent testified at the hearing before the district judge that she had been a voluntary patient at John Umstead Hospital since May 1978, that she had never left the hospital against medical advice, and that she did not intend to do so. On one occasion, in July 1978, she had been discharged by Dr. Peak, but she voluntarily returned to the hospital after one week and had applied for readmission because she felt unable to live safely outside. The reason she admitted herself to John Umstead Hospital was to obtain treatment for her suicidal tendencies. Her behavior and mental state were no worse at the time of the petition than they had been at the time of her May admission or at the time of her July discharge and readmission. She wanted to remain a patient at John Umstead Hospital, but wanted to retain her voluntary status, not be committed. No evidence was presented to contradict respondent's testimony, the only evidence presented in support of the petition being the sworn petition itself.

The policy of this State as declared by our Legislature is to encourage voluntary admissions to treatment facilities, G.S. 122-56.1, and to favor a less restrictive mode of treatment than involuntary commitment whenever appropriate. G.S. 122-58.1. Here, the respondent, although mentally ill and imminently dangerous to herself, had recognized her need for treatment by voluntarily admitting herself to the hospital. There was no showing that she had ever attempted to leave the hospital without permission of her doctor nor was there any showing that reasonable cause existed to believe that she might attempt to do so. G.S. 122-56.3 provides that "[t]he application (for involuntary admission) shall acknowledge that the applicant may be held by the treatment facility for a period of 72 hours subsequent to any written request for release that he may make." Presumably the application signed by respondent conformed with this requirement. If so, the

hospital authorities had ample opportunity to seek an involuntary commitment order should respondent attempt to leave the hospital before they felt it safe for her to do so. We hold that absent evidence to show and a finding by the district court of facts which would support a conclusion that it is reasonably necessary for the effective treatment and safety of the patient or for the safety of others to do so, a patient voluntarily admitted under G.S. 122-56.1 *et seq.* may not be ordered held involuntarily under G.S. 122-58.1 *et seq.* No such evidence or finding appears in the present record. For this reason the order appealed from is

Reversed.

Judges HEDRICK and CARLTON concur.