STATE v. McABEE

[120 N.C. App. 674 (1995)]

STATE OF NORTH CAROLINA v. MICHAEL DEAN McABEE

No. 9429SC284

(Filed 7 November 1995)

**1. Evidence and Witnesses § 176 (NCI4th)— murder prosecution—evidence of defendant's employment status—no error**

In a prosecution of defendant for the murder of his girl-friend's four-month-old daughter, the trial court did not err in

allowing the girlfriend to testify concerning defendant's employ-
ment status since defendant did not object to the questions at the
time they were asked; later in the trial defendant's own attorney
asked him a series of questions regarding his employment status;
the evidence was not evidence of bad character; the evidence was
relevant to illustrate the financial status and living conditions of
the parties involved; and the testimony helped demonstrate
access and opportunity for defendant to have committed the
crime because he was frequently at home with the child.

**Am Jur 2d, Evidence §§ 64-70.**

**2. Evidence and Witnesses § 386 (NCI4th)— murder prosecu-
tion—defendant's drinking habits—evidence admissible**

In a prosecution of defendant for the murder of his girl-
friend's four-month-old daughter, the trial court did not err in
admitting testimony related to defendant's drinking habits where
defendant failed to object to a number of references to alcohol
consumption; defendant gave detailed testimony as to his alcohol
consumption after his own attorney asked him for a description
of his drinking habits; and the evidence of his drinking habits was
relevant to show that there was a deterioration in defendant's
relationship with the child.

**Am Jur 2d, Evidence §§ 320, 321.**

**3. Evidence and Witnesses § 720 (NCI4th)— negative answer
by witness—absence of prejudice**

Defendant was not prejudiced where a witness answered neg-
atively when asked if he knew whether defendant had been hos-
pitalized for alcoholism since the answer advanced nothing of
evidentiary value.

**Am Jur 2d, Appellate Review §§ 714, 752, 753, 759.**

**4. Evidence and Witnesses § 2679 (NCI4th)— DSS records—
partial use for cross-examination**

Assuming that confidential DSS records were privileged, the
trial court did not abuse its discretion by finding that it was in the
interest of justice to allow the State to use the records to cross-
examine defendant only about his alcoholism where the issue of
defendant's alcoholism appeared in earlier testimony.

**Am Jur 2d, Witnesses § 296.**

**5. Appeal and Error § 155 (NCI4th)— absence of objection or motion—waiver of appellate review**

Defendant's failure to object to the prosecutor's question as to why he had been hospitalized, to move to strike defendant's answer that he was on cocaine, and to ask for a cautionary instruction waived his right to assert error on appeal.

**Am Jur 2d, Appellate Review §§ 135-263.**

**6. Evidence and Witnesses § 2750.1 (NCI4th)— direct testimony by defendant—opening door to cross-examination**

Defendant's testimony about his drinking habits during direct examination opened the door to the prosecutor's cross-examination of defendant as to whether he had said he was an alcoholic during a hospital interview.

**Am Jur 2d, Witnesses § 417.**

**7. Evidence and Witnesses § 2266 (NCI4th)— murder of four month old—expert medical evidence that injuries intentionally inflicted—evidence properly admitted**

In a prosecution of defendant for murder of his girlfriend's four-month-old daughter, the trial court did not err in allowing the State to introduce testimony from two medical experts that the child's injuries were intentionally inflicted, since the testimony was within each physician's area of expertise, was helpful to the factfinder, and did not embrace a legal term of art or conclusion of law.

**Am Jur 2d, Evidence §§ 1457, 1467, 1477.**

**Admissibility of expert medical testimony on battered child syndrome. 98 ALR3d 306.**

**Admissibility at criminal prosecution of expert testimony on battering parent syndrome. 43 ALR4th 1203.**

**8. Evidence and Witnesses § 3070 (NCI4th)— allegedly inconsistent statements—evidence properly excluded**

In a prosecution of defendant for murder of his girlfriend's four-month-old daughter, the trial court did not err in preventing defendant from eliciting further testimony from a defense witness regarding allegedly inconsistent statements made by the girlfriend, since there was no evidence that the statement in question was in fact a prior inconsistent statement; impeachment in this

manner is not permitted when employed as a mere subterfuge to get before the jury evidence not otherwise admissible; and the testimony in question was vague, required speculation to give it any value, and thus could have confused the jury.

**Am Jur 2d, Witnesses §§ 596 et seq.**

**Right of counsel representing party at trial, but employed by his liability insurer, to cross-examine or impeach him for asserted contradictory statements. 48 ALR2d 1239.**

**Right of defendant in criminal case to inspection of statement of prosecution's witness for purposes of cross-examination or impeachment. 7 ALR3d 181.**

Appeal by defendant, Michael Dean McAbee, from judgment entered 4 August 1993 by Judge Loto Greenlee Caviness in Henderson County Superior Court. Heard in the Court of Appeals 11 January 1995.

Defendant was convicted of second degree murder and sentenced to life in prison for the death of his girlfriend's four-month-old daughter. From this judgment and commitment, defendant appeals.

*Attorney General Michael F. Easley, by Associate Attorney General William B. Crumpler, for the State.*

*Appellate Defender Malcolm Ray Hunter, Jr. by Assistant Appellate Defender Charles L. Alston, Jr., for defendant appellant.*

McGEE, Judge.

On 25 October 1992, defendant Michael Dean McAbee and Nancy Henson rushed Henson's four-month-old daughter to the Park Ridge Hospital emergency room. Dr. Kenneth Michael Dennis conducted a thorough examination of the child and concluded she was suffering from central nervous system hemorrhaging. The child was transferred to another hospital where Dr. Dennis discovered several other bruises which were at various stages of healing, and ultimately she was sent to Memorial Mission Hospital for treatment.

Drs. Harald Kowa and Catherine Gish further evaluated the child at Memorial Mission Hospital. Dr. Kowa noted that there were bruises

on the child's chin, head and tongue. The following day, a CAT scan revealed the child's brain had begun to swell. Her heart rate began to increase, her breathing was irregular and her pupils were less responsive. Dr. Kowa concluded she suffered from gross cerebral edema, a swelling of the brain. Despite continued monitoring and treatment, the child's condition deteriorated and on 29 October, after consulting with three other physicians, Dr. Kowa pronounced the child brain dead.

Both the defendant and Nancy Henson were arrested and following an investigation, defendant was charged with the second degree murder of Henson's daughter. The State's evidence at trial included testimony from several medical experts that the injuries to the child were consistent with a battered child and shaken baby syndrome. Defendant's medical expert stated he would not have concluded the baby's death was caused by a shaking injury.

Henson testified that in late 1991 she met defendant and they began a relationship. She was already pregnant before she met defendant. According to Henson, defendant assumed full responsibility for the baby's care after her birth and for the first few weeks, he treated the baby well. His conduct soon changed and Henson began observing abusive behavior, including defendant burning the child while bathing her, necessitating special medical treatment in Cincinnati, Ohio. He spanked the child and slapped her face when she was crying or not doing exactly what he wanted her to do. Henson began to notice bruises on her daughter's body and when she confronted defendant, he said the child was injured while crawling around on the floor or bumping into her bassinet. On one occasion, Henson noticed her daughter's eye was scratched and she was told by defendant that the child had scratched it herself.

Both Henson and Deputy Walter Harper of the Henderson County Sheriff's Department testified that defendant hated to hear the child cry and several times he picked up the child by the torso, placed his hands under her arms, and shook her to stop the crying. Henson said defendant would often take her daughter into another room of the trailer until the crying ceased or he would shake the child while going from one room of the trailer to another.

On the day the child was taken to the emergency room, Henson testified she woke up mid-day and found her daughter on the floor, motionless, with blood all over her mouth. Defendant attempted to

get the child to respond by pulling her ears, pushing on her chest and shaking her. Defendant claimed that as he started to feed the child baby food, she choked on it. The couple then rushed the child to the hospital emergency room.

On cross-examination of Henson, defense counsel emphasized inconsistencies in her testimony. Henson admitted she may have told the doctors and police that she was feeding her daughter when she started choking on the day she was taken to the emergency room. Additionally, Henson acknowledged she told the Department of Social Services she had never seen defendant shake her daughter.

Defendant gave a different account of the various incidents Henson described. He testified it was Henson who was bathing her daughter when she was burned. He stated he noticed bruises on the child and when he confronted Henson, she speculated the child must have crawled out of the bassinet. Defendant denied shaking the baby in any manner necessary to cause the injuries she sustained. Finally, defendant testified that although he was innocent, he decided to take the blame for the child's injuries because he felt that he was better able to handle incarceration than Henson.

As to the incident on the day the child was taken to the hospital, defendant stated that Henson fed the child that day and that when he woke up, he started down the hallway to go to the bathroom, but Henson would not allow him to enter the living room. He pushed her aside and found the child on the floor choking. He noticed some blood on the floor. Defendant attempted to assist the child by clearing her throat, breathing into her mouth, picking her up by the feet, hitting her on her back and by pushing on her chest. They then took the child to the emergency room.

On 3 August 1993, defendant was found guilty of second degree murder and sentenced to life in prison. Defendant brings forward four issues on appeal. He claims the trial court erred (1) in allowing State's witness, Nancy Henson, to testify regarding prior bad acts of the defendant; (2) in allowing the State to impeach defendant with prior acts of misconduct which do not go to truthfulness; (3) in allowing the State to introduce testimony that the child's injuries were intentionally inflicted; and (4) in preventing defendant from inquiring into inconsistent statements made by Nancy Henson, the key prosecution witness. For the reasons below, we disagree with defendant's contentions.

I.

Defendant first argues the trial court erred in allowing Nancy Henson to testify regarding defendant's prior bad acts in violation of N.C.R. Evid. 404. In support of his contention, defendant cites four exchanges at trial which he claims violate the rule. The first such instance involves three questions related to defendant's employment status and the other three examples involve defendant's drinking habits. Defendant argues these questions were designed by the State to show evidence of bad character, that defendant was lazy and had an alcohol problem, and this evidence predisposed the jurors to believe defendant was capable of murder. The State argues defendant exaggerates the effect of the evidence that was admitted and more importantly, that defendant waived objection by failing to object or move to strike at critical times during the trial. Additionally, the State points out that similar evidence was admitted without objection at other times during the trial and therefore, the benefit of the earlier objection is lost under *State v. Murray,* 310 N.C. 541, 313 S.E.2d 523 (1984), *overruled in part on other grounds in State v. White,* 322 N.C. 506, 518, 369 S.E.2d 813, 819 (1988). We agree.

[1] As to the employment testimony, the State asked Henson whether defendant was working and if he had worked during the four months after the child's birth. Henson responded "[n]o, sir" to those two questions with no objection being raised by defendant. The State then asked, "[w]hat did he do?" and it was at that point that defense counsel objected. The court overruled the objection and Henson answered, "[t]here was one time that he went on a truck with Mr. Don Blue, but other than that he never worked at all. He was always at the house."

Later in the trial, defendant's own attorney asked defendant a series of questions regarding his employment status. Defendant testified he stopped working just before he and Henson began their relationship. In response to the question of whether he lost his job because he was spending too much time with Henson, he stated, "I started—well, it was my fault—I got careless and started taking them where they wanted to go and I was the only one that had a vehicle and they depended on me, so I took them where they wanted to go, and I didn't go to work." The benefit of the earlier objection was lost when similar evidence was admitted without objection later during the trial. *State v. Kyle,* 333 N.C. 687, 697, 430 S.E.2d 412, 417 (1993).

We also note this evidence was not character evidence used for the purpose of proving that defendant acted in conformity therewith. Defendant's employment status was hardly related to his propensity to commit murder. Furthermore, this evidence is relevant to illustrate the financial status and living conditions of the parties involved and the testimony helped demonstrate access and opportunity for defendant to have committed the crime because he was frequently at home with the child. Relevant evidence in criminal cases is "any evidence calculated to throw any light upon the crime charged" and should be admitted by the trial court. *State v. Huffstetler*, 312 N.C. 92, 104-05, 322 S.E.2d 110, 118-19 (1984), *cert. denied*, 471 U.S. 1009, 85 L. Ed. 2d 169 (1985), *denial of habeas corpus affirmed sub nom. Huff v. Dixon*, 28 F.3d 1209 (4th Cir. 1994), *cert. denied sub nom. Huff v. French*, 115 S. Ct. 1258, 131 L. Ed. 2d 138 (1995).

[2] The next three exchanges defendant challenges involve testimony related to defendant's drinking habits. The first such instance was, as follows:

Q. Well, did at [sic] time—did a time come when things took a turn either for the better than that or the worse than that? Did a time come when he started drinking, Ms. Henson?

MR. EDNEY: Objection.

THE COURT: Sustained at this point.

Q. Well, did things—did any event in his life—his conduct—change after about—the child—when the child was about two weeks old?

A. Yes, he started drinking.

Q. Had he been, during the relationship with you, had he had a problem with drinking prior to that?

A. Yes.

MR. EDNEY: Objection.

THE COURT: Overruled. I'll let her respond, if she knows.

A. Yes.

Q. And then about the second week of her life, what did he start drinking?

MR. EDNEY: Objection.

THE COURT: I'll overrule it and let her respond, if she knows.

A.   Just anything he could get a hold of.

MR. EDNEY: Motion to strike.

THE COURT: Sustained and strike at this point.

The second reference to alcohol consumption was when the State asked Henson if defendant's conduct toward the child changed when he was drinking. Defense counsel objected but the trial court overruled the objection and Henson responded, "[h]e really didn't start doing anything with her. He'd always start with me." The third reference to defendant's drinking habits occurred later during Henson's testimony when the State asked her if there was a time when defendant started drinking, and defense counsel objected. The court overruled the objection, but the State rephrased the question and asked what defendant was drinking after returning from Cincinnati (where the child had been taken for burn treatment earlier in the summer). Henson responded that defendant was drinking liquor and beer.

Defendant failed to object or move to strike a number of the references to alcohol consumption to which he now objects and some of the objections he did raise were sustained. Therefore, defendant has no grounds to except on those points. *State v. Barton*, 335 N.C. 696, 709, 441 S.E.2d 295, 302 (1994). Like the employment questions, we note that defendant gave detailed testimony as to his alcohol consumption after his own attorney asked him for a description of his drinking habits during the time he was involved with Henson. Defendant stated, "I didn't really drink at the house. When I was drinking, . . . I was gone with friends or wherever, and there was [sic] occasions that me [sic] and her [sic] would sit around the house and drink together . . . ." Furthermore, defendant volunteered that he only drank Canadian Mist and that he would "sit around and sip when me [sic] and her [sic] were together, 'cause [sic] I knew what it would be if I got drunk." Since similar evidence of defendant's drinking habits was admitted without objection at other times during the trial, the benefit of the few objections he raised earlier at trial are now waived. *Kyle*, 333 N.C. at 697, 430 S.E.2d at 417.

Furthermore, the evidence of defendant's drinking habits was relevant. The prosecutor was attempting to show there was a deterioration in defendant's relationship with the child. There had been some evidence that in the beginning, defendant had been responsible and caring toward the child but this began to change a few weeks after

her birth. Therefore, the State was appropriately developing this evidence, notwithstanding the fact that much of this testimony was not especially probative. This assignment of error is overruled.

## II.

Defendant next argues the trial court erred in allowing the State to impeach the defendant with prior acts of misconduct which were not probative of truthfulness. While defendant has not properly matched his assignments of error to the question presented as required under North Carolina Rule of Appellate Procedure 28(b)(5) we will, in our discretion, consider the arguments presented in defendant's brief.

In support of his contentions, defendant points to the following: (1) an exchange between the State and defendant's brother about defendant's alcoholism, (2) the court's order during voir dire as to the State's use of Department of Social Services (hereinafter DSS) files by the State to cross-examine defendant, and (3) the prosecutor's cross-examination of defendant in which he asked about defendant's previous hospitalization for alcohol abuse.

[3] In the first challenged testimony, the State asked defendant's brother, "[defendant has] been hospitalized in the past for alcoholism, has he not?" Defendant objected and the court sustained the objection. The State then asked the witness if he knew whether defendant had been hospitalized for alcoholism and the court overruled defendant's objection to that question. The witness then answered, "[n]o, I don't." Even if this were error, we conclude that the testimony was harmless error. The witness' answer advanced nothing of evidentiary value and defendant suffered no prejudice. In order to obtain relief, a defendant must show that the error asserted is material and prejudicial. *State v. Franklin*, 23 N.C. App. 93, 96, 208 S.E.2d 381, 383 (1974).

[4] Defendant's next argument is that the trial court improperly allowed the State to use confidential DSS records, which contained some medical records, to cross-examine defendant. He maintains that this information was privileged and that he never waived this privilege before or during the trial. Although defendant did not adequately develop this argument, a review of the record reveals that the trial court conducted a voir dire hearing, and made the following findings of fact and conclusions as to the introduction of the DSS records during cross-examination:

[The DSS] records are confidential in nature, . . . *defendant's counsel subpoenaed them* and was given access to them by virtue of Court order . . . . [T]he Court will find as the issue of the defendant's alcoholism or abuse of alcohol appears in earlier testimony, the Court will permit cross examination into that area only. *The rest of the files are determined to be confidential.* That issue [alcoholism] has been raised, Court will find it's in the interest of justice, . . . [to] proceed into that area. (emphasis added)

Assuming, *arguendo*, this confidential file was privileged information and the privilege was not waived by defendant, this privilege is a statutory creation, and is qualified rather than absolute. The law allows the trial court discretion to require disclosure of privileged communications so long as the disclosure is "necessary to a proper administration of justice." *In Re Farrow*, 41 N.C. App. 680, 682, 255 S.E.2d 777, 779 (1979); *See generally State v. Efird*, 309 N.C. 802, 309 S.E.2d 228 (1983). Since the trial court found it was in the interest of justice to allow a limited inquiry into the DSS records on defendant's alcoholism, we conclude the trial court did not abuse its discretion.

Defendant's final argument is that the trial court erred in allowing the following exchange:

Q.  Mr. McAbee, do you remember being, in the past, being hospitalized for alcoholism?

A.  No, sir.

Mr. Edney: Objection.

The Court: Sustained at this point.

Q.  Do you—have you been—were you hospitalized, Mr. McAbee, over at a place called Crossroads in Chattanooga, over in Tennessee, for alcoholism? Do you remember that?

Mr. Edney: Objection

The Court: I'm going to overrule that and permit him to respond, if he knows.

A.  I was hospitalized, but it was not for alcohol.

Q.  What was it for?

A.  I was on cocaine at the time.

Q.  Let me—let me ask you this—

A.  And I went on my own free will.

Q. I understand that; I'm not doubting that, Mr. McAbee, but I noticed on page 13 of your hospital interview you said, "I am an alcoholic."

MR. EDNEY: Objection.

THE COURT: I'm going to overrule that and permit him to respond.

Q. Page 13 of your hospital interview, do you remember saying, "I am an alcoholic"; do you remember that?

A. I am.

The trial court sustained defendant's objection to the State's first question, but defendant did not move to strike the answer. By failing to move to strike this testimony, defendant waived the right to assert error on appeal under *Barton*, 335 N.C. at 709, 441 S.E.2d at 302.

Defendant also objected to the State's second question about whether defendant remembered being hospitalized in Chattanooga for alcoholism. The court overruled defendant's objection and defendant answered he was hospitalized, but not for alcohol. While we detect no error, any possible error was certainly not so material as to have amounted to prejudicial error. *See Franklin*, 23 N.C. App. at 96, 208 S.E.2d at 383.

[5] The State then asked the follow-up question of why defendant had been hospitalized. Defendant answered he was on cocaine at the time. Defense counsel never objected to the question, never moved to strike the offensive testimony, and never asked for a cautionary instruction. "[F]ailure to object to errors at trial constitutes a waiver of the right to assert the errors on appeal." *Murray*, 310 N.C. at 545, 313 S.E.2d at 527. This testimony did not rise to the level of plain error in that it was not so "*fundamental* [an] error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done." *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (quoting *United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir. 1982), *cert. denied*, 459 U.S. 1018, 74 L. Ed. 2d 513 (1982)).

[6] Defendant's final objection occurred after the State asked defendant whether he had said, "I am an alcoholic" during his hospital interview. The court overruled the objection and defendant responded, "I am." Even if this evidence would not otherwise have been admissible, the law permits the introduction of such evidence to explain or rebut evidence offered by the defendant himself. *State v. Brown*, 310 N.C.

563, 572, 313 S.E.2d 585, 590 (1984) (quoting *State v. Albert*, 303 N.C. 173, 177, 277 S.E.2d 439, 441 (1981)). Prior to this exchange, defendant had voluntarily testified about his drinking habits during direct examination by defense counsel. Since the door had already been opened by defendant, the State was entitled to cross-examine defendant about his alcohol consumption.

None of the three arguments constituted prejudicial error; therefore, we overrule this assignment of error.

III.

[7] Defendant's third argument is that the trial court erred in allowing the State to introduce testimony from two medical experts that the child's injuries were intentionally inflicted. He argues this testimony was improper because it permitted the experts to testify about a precise legal standard and conclusion. We disagree.

Rule 702 of the North Carolina Rules of Evidence allows an expert witness to offer an opinion if "scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." N.C. Gen. Stat. § 8C-1, Rule 702 (1992). This rule has been construed to allow expert testimony that aids the factfinder "in drawing certain inferences from facts, and the expert is better qualified than the [factfinder] to draw such inferences." *In re Hayden*, 96 N.C. App. 77, 82, 384 S.E.2d 558, 561 (1989) (quoting *State v. Anderson*, 322 N.C. 22, 366 S.E.2d 459, *cert. denied*, 488 U.S. 975, 102 L. Ed. 2d 548 (1988) (citations omitted). "A trial court is afforded wide latitude in applying Rule 702 and will be reversed only for an abuse of discretion." *Id.* We find no such abuse of discretion is present under these facts.

Defendant first objected to testimony elicited from Dr. Thomas Clark, a forensic pathologist in the state Medical Examiner's office. The State asked him if he had an opinion "as to whether the shaking injury that [he] diagnosed as this child's cause of death is consistent with intentionally inflicted injuries?" Dr. Clark responded, "[y]es. It had to be an intentionally inflicted injury." During that same exchange, the State asked Dr. Clark if he had an opinion "as to whether the fracture of the right arm is consistent with being an intentionally inflicted injury." Defendant objected and the State clarified the question by adding, "as opposed to accidentally sustained?" After defendant's objections were overruled, Dr. Clark responded:

It is inconceivable to me that a four-month-old child could do anything to injure this arm without assistance. The child can't walk; the child can barely roll over, if the child can roll over. And for those reasons, I conclude that this injury would have to have been inflicted upon this child in some way.

The other medical expert who provided testimony about intentionally inflicted injuries was defense witness, Dr. Joseph Scheller, a pediatric neurologist at the University of Maryland. The testimony in question was the following:

Q.   Does the word "abused" imply intentional abuse—the scenario that I've given you: corneal abrasion, severe immersion burn, untreated fracture to the right arm, tongue laceration, lethargy, possible seizures, serious injury to the central nervous system, cut tongue and bruises of various ages—you—do you not—you as a medical professional not agree that the number one differential diagnosis would not simply be abuse, but intentional, physical abuse?

MR. EDNEY: Objection, Your Honor.

Q.   That's my question.

THE COURT: Just a minute. I'm going to overrule and let him respond, if he can.

A.   I would be very suspicious that this child had been intentionally abused. I need to qualify that by saying—am I allowed to?

THE COURT: Yes, sir, you may.

Q.   [sic]—that the corneal abrasion is not high on the list as far as the suspicious injuries, based on the description that was offered by the parents. The burn was described—the caretaker did have an excuse or a—how would I put it?—a reason.

The other injuries are more suspicious: the cut tongue, the broken arm, and the blood in the spinal fluid.

The record indicates that both Dr. Clark and Dr. Scheller are duly licensed, board certified medical physicians. In his capacity as a forensic pathologist, Dr. Clark's areas of expertise include the performance of autopsies and the determination of the cause and manner of death of children as well as adults. Dr. Scheller is an assistant professor at the University of Maryland and specializes in the area of pediatric neurology. Both physicians testified they have had experi-

ence with the medical conditions known as Battered-Child Syndrome and Shaken-Baby Syndrome; both gave detailed explanations of the general nature of these conditions and how they are medically evaluated. In discussing the specific injuries sustained by Henson's daughter, each physician offered his opinion as to whether the injuries were consistent with intentionally, as opposed to accidentally, inflicted injuries. The trial court did not abuse its discretion in allowing the testimony since it was within each physician's area of expertise, was helpful to the factfinder and did not embrace a legal term of art or conclusion of law. We therefore overrule this assignment of error.

IV.

[8] Defendant's final argument is that the trial court erred in preventing him from eliciting further testimony from defense witness, Linda Burrell, regarding allegedly inconsistent statements made by Henson. The testimony in question was the following:

Q. What, if anything else, did Nancy ever say during your conversations in January and February?

A. She said once that her body was so good that she had a man that was going to pay for her crime.

MR. LEONARD: Objection. Motion to strike. Irrelevant.

THE COURT: Sustained and strike.

Defendant argues the exchange in question constituted a valid impeachment of Henson by a prior inconsistent statement and that the trial court should have admitted this testimony for impeachment purposes. However, defendant has not cited, and we are unable to find, any statements in Henson's testimony which support the conclusion that the statement now at issue amounts to a prior inconsistent statement. While prior inconsistent statements are admissible for impeachment purposes, impeachment in this manner is not permitted when "employed as a *mere subterfuge* to get before the jury evidence not otherwise admissible." *State v. Hunt*, 324 N.C. 343, 349, 378 S.E.2d 754, 757 (1989) (quoting *United States v. Morlang*, 531 F.2d 183, 190 (4th Cir. 1975).

Moreover, the testimony in question is vague and requires speculation to give it any value. Because it could have confused the jury, the trial court properly excluded the testimony and we therefore overrule this assignment of error. *See* N.C.R. Evid. 403.

We hold that defendant received a fair trial, free from prejudicial error.

No error.

Judges LEWIS and WYNN concur.