STATE OF NORTH CAROLINA v. BRIAN KEITH MURPHY

No. COA04-344

(Filed 16 August 2005)

1. **Appeal and Error— preservation of issues—failure to argue**

Defendant's assignments of error that were not argued in his brief are deemed abandoned pursuant to N.C. R. App. P. 28(b)(6).

2. **Evidence— expert opinion testimony—injuries not an accident**

The trial court did not err in a first-degree murder case by denying defendant's motion to exclude testimony from medical experts that the minor child's head injuries could not have been the result of an accident, because: (1) a medical expert may testify that the wounds presented are inconsistent with accidental origin; and (2) both experts based their opinions upon their years of experience as pathologists during which they performed and consulted on numerous autopsies.

---

STATE v. MURPHY

[172 N.C. App. 734 (2005)]

**3. Evidence— character—peacefulness**

The trial court did not err in a first-degree murder case by limiting testimony regarding defendant's interaction with other children where defendant attempted to show specific acts of nonviolence toward other children, because: (1) although defendant's allegedly peaceable character was pertinent to the charge of first-degree murder, neither defendant's character nor a trait of his character was an essential element of the charge or defendant's defense; and (2) elicitation of evidence regarding defendant's character during direct testimony must have been accomplished via opinion or reputation testimony rather than specific instance testimony.

**4. Homicide— inference of malice—blows to child's head**

The trial court did not err by instructing the jury in a homicide case that "malice may be inferred from evidence that the victim's death was done by an attack by hand alone without the use of other weapons, where the attack was made by a mature man upon a defenseless infant" where the evidence at trial tended to show that defendant was a twenty-eight-year-old male and the victim was a three-year-old child who was suffering from a broken collarbone, and that the child received multiple traumatic blows to the head which were intentionally inflicted while the child was in defendant's care.

**5. Sentencing— aggravating factors not submitted to jury— _Blakely_ error**

The trial court erred by sentencing defendant for second-degree murder in the aggravated range because: (1) the aggravating factors that the victim of the crime was very young, that defendant took advantage of a position of trust or confidence to commit the offense, and that defendant was absent without leave from the United States Army at the time of the offense were not submitted to the jury; and (2) harmless error analysis cannot be conducted on _Blakely_ Sixth Amendment violations.

Appeal by defendant from judgment entered 28 July 2003 by Judge W. Douglas Albright in Rockingham County Superior Court. Heard in the Court of Appeals 18 November 2004.[1]

---

1. By order of this Court, the filing of this opinion was delayed pending our Supreme Court's decision in State v. Allen, 359 N.C. 425, —— S.E.2d —— (Filed 1 July 2005) (No. 485PA04).

*Attorney General Roy Cooper, by Special Deputy Attorney General Norma S. Harrell, for the State.*

*Megerian & Wells, by Franklin E. Wells, Jr., for defendant-appellant.*

TIMMONS-GOODSON, Judge.

Brian Keith Murphy ("defendant") appeals his conviction for second-degree murder. For the reasons discussed herein, we hold that defendant received a trial free of prejudicial error, but we remand the case for resentencing.

The State's evidence presented at trial tends to show the following: During November 2002, defendant and Michelle May ("Michelle") shared a residence with Michelle's two children, three-year-old Brian ("Brian") and six-year-old Blair ("Blair"). On 4 November 2002, defendant was babysitting Brian while Michelle was at work. At approximately 1:00 p.m., defendant went to Brian's room and discovered that Brian was wrapped in the covers of his bed and was not moving. Defendant noticed that Brian's lips were blue and that Brian had no pulse and was not breathing. After unsuccessfully attempting to revive Brian via CPR, defendant called 9-1-1 and informed the emergency operator that Brian had suffocated.

At approximately 1:04 p.m., Emergency Medical Technician James Cockrill ("Cockrill") arrived at defendant's residence. Cockrill immediately initiated CPR on Brian and asked defendant "how long he had been down." Defendant responded that Brian had laid down in bed at 9:00 a.m. that morning, and that after defendant had heard "gurgling" coming from Brian's bedroom, he discovered Brian "twisted up in a blanket on the bed." Cockrill noticed that Brian had a large bruise on his left jaw and several bruises on his shoulder. Defendant informed Cockrill that the bruises were from prior injuries. A short time later, several other emergency responders arrived at the scene. Brian was placed in an ambulance and transported to an area hospital, but medical personnel were unable to revive him.

Rockingham Sheriff's Department Deputy Mark Kennon ("Deputy Kennon") was the first law enforcement official to arrive at defendant's residence. Deputy Kennon encountered defendant as he attempted to follow the ambulance to the hospital, and Deputy Kennon informed defendant that he needed to gather some information regarding the incident. Defendant told Deputy Kennon that at

approximately 9:00 a.m., defendant assisted Brian in using the restroom and then followed Brian back into his bedroom, where he watched Brian return to bed. Defendant informed Deputy Kennon that he then returned to the living room of the residence, where he slept until approximately 12:00 p.m. At approximately 12:00 p.m., defendant went to Brian's bedroom and discovered Brian covered in blankets and unresponsive. Defendant told Deputy Kennon that before calling the emergency operator, he tried unsuccessfully to revive Brian via CPR.

After defendant related the story to Deputy Kennon, Rockingham County Sheriff's Department Detective Phillip Smith ("Detective Smith") arrived at defendant's residence. At approximately 4:00 p.m., Detective Smith drove defendant to the Detective Division of the Sheriff's Department, where defendant would be able to provide a formal statement of the events and answer more questions. Following their arrival at the Detective Division, defendant and Detective Smith were joined by Rockingham County Sheriff's Department Lieutenant Perry Brookshire ("Lieutenant Brookshire"), who had questioned defendant earlier at his residence. Lieutenant Brookshire advised defendant of his *Miranda* rights and informed defendant that he was not under arrest and could leave at any time. The officers then began questioning defendant regarding the incident.

During the ensuing interview, defendant initially recounted the version of the incident he provided to the officers at his residence. However, after approximately an hour and a half of questioning, defendant "broke down and started crying[,]" and thereafter provided a second version of the incident. In his second version of the incident, defendant stated that at approximately 7:15 a.m., he heard Brian "call out" from his room. Defendant went into Brian's room and picked Brian up under his arm and around his waist. Defendant stated that he then "dropped [Brian] and tried to catch him [but] [a]ll [he] got was [Brian's] ankles and [he] yanked [Brian], trying to keep him from hitting the floor." Defendant stated that Brian's head "hit the floor twice[,]" and when defendant "tried to catch it, it was like a whipping effect that caused his head to hit the floor." Defendant then "picked [Brian] up by his thighs" and noticed that Brian "looked like he was out of breath." Defendant took Brian into the living room of the residence, where he examined Brian for injuries. After seeing no injuries, defendant "asked [Brian] several times if he was okay and he said un-huh." At approximately 9:00 a.m., defendant took Brian to his room, placed Brian in bed, and covered him up. At approximately 12:45

p.m., defendant returned to Brian's room and "tried [unsuccessfully] to wake Brian up."

In a letter sent to Michelle on 4 December 2002, defendant provided a third version of the incident. In the letter, defendant purported to tell Michelle "[t]he real truth about what happened that day." The letter explains that after he helped Brian use the restroom, defendant started telling Brian "I'm going to get you! [G]oing to get ya!" like he "always" did. However, while he was chasing Brian down the hall, Brian "suddenly stopped, or tr[i]ed to stop and turn around." In the letter, defendant states that when Brian tried to stop, Brian "fell back and fell down." Defendant then provides the following explanation for Brian's injuries:

> I heard him hit his head when he fell back on the floor. Well when he turned and fell I was right on top of him, and I meant to take a short step so I could leap over him but I misjudged where he was because I was worried about me falling forward, and I stepped right on his mid section. I didn't see where because I wasn't looking down but I know it was his mid section. . . . I picked him up [and] held him, and sat down on the couch with him. I didn't think that I had stepped on him that hard. Well I held him until he stopped crying[.] . . . I kept asking him if he was O.K. and he keep telling [me] uh-uh (yes), like he did. So I ask him if he wanted to lay back down, and he said he did so he got back [in bed and] I went back into the living room. . . . Michelle, at no time did I think he was badly injured or he was at any risk when I put him back to bed. Believe me I was as shocked as anyone, but I did do everything I could to save him.

On 3 February 2003, defendant was indicted for the first-degree murder of Brian. Defendant's trial began the week of 21 July 2003. Prior to trial, defendant moved the trial court to suppress the State's medical experts' conclusions and opinions regarding Brian's injuries. Specifically, defendant objected to the experts' statements that Brian's injuries were intentionally inflicted and were not accidental. The trial court denied defendant's motion, and the case proceeded to trial.

At trial, defendant testified that his third version of the incident was a true account of the events, and that he told Detective Smith and Lieutenant Brookshire the second version of the incident after they "kept telling [him] that if it was an accident there would be nothing wrong with that; [he] would be free to go." Following the close of all

the evidence, the trial court instructed the jury regarding both first-degree and second-degree murder. On 28 July 2003, the jury found defendant guilty of second-degree murder. The trial court subsequently found as aggravating factors: (i) that the victim of the crime was very young; (ii) that defendant took advantage of a position of trust or confidence to commit the offense; and (iii) that defendant was absent without leave from the United States Army at the time of the offense. As a mitigating factor, the trial court found that defendant had a good reputation in the community in which he lived. After concluding that the aggravating factors outweighed the mitigating factor, the trial court sentenced defendant to 192 to 240 months imprisonment. Defendant appeals.

[1] We note initially that defendant's brief does not contain arguments supporting each of the original assignments of error. Pursuant to N.C.R. App. P. 28(b)(6) (2005), the omitted assignments of error are deemed abandoned. Therefore, we limit our present review to those assignments of error properly preserved by defendant for appeal.

The issues on appeal are: (I) whether the trial court erred by denying defendant's motion to exclude testimony from medical experts; (II) whether the trial court erred by limiting testimony regarding defendant's interaction with other children; and (III) whether the trial court erred in instructing the jury.

[2] Defendant first argues that the trial court erred by denying his motion to exclude testimony from the State's medical experts. Defendant asserts that the medical experts should have been prohibited from testifying that, in their opinion, Brian's injuries could not have been the result of an accident. We disagree.

The Rules of Evidence allow an expert witness to offer testimony in the form of opinion, even if it embraces the ultimate issue to be decided by the factfinder. N.C. Gen. Stat. § 8C-1, Rules 702, 704 (2003). "Expert testimony as to a legal conclusion or standard is inadmissible, however, at least where the standard is a legal term of art which carries a specific legal meaning not readily apparent to the expert witness." *State v. Jennings*, 333 N.C. 579, 598, 430 S.E.2d 188, 196, *cert. denied*, 510 U.S. 1028, 126 L. Ed. 2d 602 (1993).

In the instant case, Dr. Deborah Radisch ("Dr. Radisch"), a forensic pathologist who performed an autopsy on Brian, testified to several head injuries sustained by Brian prior to his death. Dr. Radisch testified in pertinent part as follows:

Q: And are either one of these injuries that you described, either one of the three that you said were distinct, alone would have caused the death or a combination of the three?

A: I can't really say which one or a combination. I think that at least two of them have the potential to cause unconsciousness and death. It's difficult just by looking at the contusions to tell how severe the injury was, and I can't tell by the brain examination which one of those or which one of any of them caused the brain injury; but there are indications on the scalp that two of them were severe scalp—at least severe scalp contusions.

Q: Which two are those?

A: The one at the left back of the head and the one over the left side of the head.

Q: And do you have an opinion how long this child could have lived after the onset of the injuries?

A: Well, in this case we know that he was unresponsive and practically dead when he got to the emergency room. It could be several hours until his brain—could be anywhere from—it's always difficult to say. An hour to maybe several hours, he would just eventually lapse into a [coma] and die without any intention.

Q: And are these the type of injuries that a three-year-old could inflict upon himself?

A: I don't think—do I need to have a mechanism for that? Inflicted by himself in what way?

Q: By falling down on the floor?

A: In my opinion this [is] not an accidental injury, none of the head trauma is.

Dr. Aaron Gleckman ("Dr. Gleckman"), a second forensic pathologist who consulted on Brian's autopsy, offered the following pertinent testimony at trial:

Q: In your examination of Baby Brian's brain, were you able to determine how many injuries you were looking at?

A: Well, along with the brain, I took a look at the external photos of the autopsy. I was not present at the autopsy, but Dr.

Radisch showed me the photographs. In seeing those and seeing the findings, I came to the conclusion—and knowing that there were at least four impact sites on the scalp, I concurred with Dr. Radisch and was clear that the cause of death was from blunt force head trauma.

. . . .

Q: Based on your opportunity to examine Baby Brian Keith May's brain, do you have an opinion about the cause of death?

A: Yes, I do.

Q: What is your opinion?

A: It's blunt force head trauma.

Q: In your opinion is this the kind of—could this injury have been consistent with an accident?

. . . .

A: Absolutely not.

Q: Why?

A: If you all have children, nieces and nephews you take care of, they fall down all the time. Numerous, numerous studies have shown that children, especially age three, don't die from ground-level falls, that type of an accident; and if they did, we probably would have no one grow up past the age of five because children fall all the time. In this case there are several impacts to the head. If he had been in a fall and it was from a significant height, he'd have one, if any; he might have none.

Defendant contends that this evidence should have been suppressed because it "allowed the doctors to tell the jury that the [S]tate had met its burden of proof on one of the elements necessary to the murder charge, that the injuries leading to death were inflicted intentionally." However, N.C. Gen. Stat. § 8C-1, Rule 702(a) provides that "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion." Our Supreme Court has recognized that

in determining whether expert medical opinion is to be admitted into evidence[,] the inquiry should be not whether it invades the

province of the jury, but whether the opinion expressed is really one based on the special expertise of the expert, that is, whether the witness because of his expertise is in a better position to have an opinion on the subject than is the trier of fact.

*State v. Wilkerson,* 295 N.C. 559, 568-69, 247 S.E.2d 905, 911 (1978). Thus, "[t]he test is . . . whether the 'opinion required expert skill or knowledge in the medical or pathologic field about which a person of ordinary experience would not be capable of satisfactory conclusions, unaided by expert information from one learned in the medical profession.' " *Id.* at 569, 247 S.E.2d at 911 (quoting *State v. Powell,* 238 N.C. 527, 530, 78 S.E.2d 248, 250 (1953)).

In the instant case, both Dr. Radisch and Dr. Gleckman offered evidence via testimony and opinion consistent with the testimony and opinion previously allowed by this Court. *See State v. McAbee,* 120 N.C. App. 674, 686, 463 S.E.2d 281, 288 (1995) (holding that the trial court did not abuse its discretion by allowing two pathologists to offer their opinion as to whether child's injuries were intentionally or accidentally inflicted), *disc. review denied,* 342 N.C. 662, 467 S.E.2d 730 (1996); *State v. West,* 103 N.C. App. 1, 8, 404 S.E.2d 191, 197 (1991) ("Our appellate courts have held that, based on a child's clinical presentation and history, a medical expert may testify that the wounds presented are inconsistent with accidental origin. The question and answer in this case falls under this general rule." (citations omitted)). Dr. Radisch and Dr. Gleckman both based their opinions upon their years of experience as pathologists, during which they performed and consulted on numerous autopsies. Dr. Radisch explained that she based her determination on the location of Brian's injuries, noting that the curvature of Brian's skull would have prevented the four distinct areas of contact on Brian's scalp from occurring as a result of an accidental fall. Dr. Radisch testified that she believed Brian suffered at least two "separate" injuries, or at least two "impacts," and that the lack of any distinct contrecoup brain contusions led to her conclusion that Brian had not been injured by a fall. As detailed above, Dr. Gleckman based his conclusion on his recognition that children do not die from ground level falls, and that the amount of injuries to Brian's head prevented him from determining that Brian had fallen from a height significant enough to kill him. In light of the foregoing, we conclude that the trial court did not err by allowing the doctors to testify that, in their opinion, Brian suffered intentionally, rather than accidentally, inflicted injuries. Therefore, defendant's first argument is overruled.

**[3]** Defendant next argues that the trial court erred by limiting testimony from defense witnesses regarding defendant's interaction with other children. At trial, defendant offered testimony from several mothers of other children that defendant babysat. In order to allow defendant to elicit testimony concerning his character for peacefulness, the trial court allowed defendant to question the witnesses regarding his interaction with other children. However, the trial court prohibited defendant from specifically questioning the witnesses regarding whether he had abused other children. Defendant asserts that the trial court erred by restricting the witnesses' testimony, in that such evidence was admissible as competent character evidence. We disagree.

The transcript reveals that the trial court based its decision upon this Court's opinion in *State v. Hoffman*, 95 N.C. App. 647, 383 S.E.2d 458 (1989), *disc. review denied*, 326 N.C. 52, 389 S.E.2d 101 (1990). In *Hoffman*, the defendant argued that the trial court erred by "not allowing [his] witnesses to testify that he had not molested their children and by not allowing several children to testify that he had not molested them." *Id.* at 648, 383 S.E.2d at 459. This Court disagreed with the defendant's argument, holding that "[s]uch testimony was totally irrelevant" to the defendant's trial. *Id.* We conclude that our decision in *Hoffman* is applicable to the instant case.

Rules 404 and 405 of the Rules of Evidence address the admission of character evidence at trial. "While Rule 404 provides for the circumstances in which character evidence is admissible, Rule 405 provides for the form in which it may be presented." *State v. Bogle*, 324 N.C. 190, 200-01, 376 S.E.2d 745, 751 (1989). Although Rule 404(a) "is a general rule of exclusion, prohibiting the introduction of character evidence to prove that a person acted in conformity with that evidence of character[,]" the Rule permits "the accused to offer evidence of a 'pertinent trait of his character' as circumstantial proof of his innocence." *Id.* at 201, 376 S.E.2d at 751 (quoting N.C. Gen. Stat. § 8C-1, Rule 404(a)(1)). "In criminal cases, in order to be admissible as a 'pertinent' trait of character, the trait must bear *a special relationship to* or *be involved in* the crime charged." *Bogle*, 324 N.C. at 201, 376 S.E.2d at 751 (emphasis in original). "Thus, in the case of a defendant charged with a crime of violence, the peaceable character of the defendant would be 'pertinent[.]' " *Id.*

In the instant case, as discussed above, defendant attempted to elicit testimony during direct examination regarding specific acts of nonviolence towards other children. However, Rule 405 provides

that, where evidence of character or a trait of character is admissible under Rule 404, "proof may be made by testimony as to reputation or by testimony in the form of an opinion." N.C. Gen. Stat. § 8C-1, Rule 405(a) (2003). Specific incidents of conduct may be explored during cross-examination. *Id.* We note that "[i]n cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct." N.C. Gen. Stat. § 8C-1, Rule 405(b). However, we also note that

> Of the three methods of proving character provided by the rule, evidence of specific instances of conduct is the most convincing. At the same time it possesses the greatest capacity to arouse prejudice, to confuse, to surprise, and to consume time. Consequently the rule confines the use of evidence of this kind to cases in which character is, in the strict sense, in issue and hence deserving of a searching inquiry. When character is used circumstantially and hence occupies a lesser status in the case, proof may be only by reputation and opinion.

N.C. Gen. Stat. § 8C-1, Rule 405 (commentary).

In the instant case, although defendant's allegedly peaceable character was pertinent to the charge of first-degree murder, neither defendant's character nor a trait of his character were essential elements of the charge or defendant's defense. Thus, elicitation of evidence regarding defendant's character during direct testimony must have been accomplished via opinion or reputation testimony rather than specific instance testimony. Therefore, in light of the foregoing, we conclude that the trial court did not err by limiting defendant's witnesses to testimony regarding defendant's reputation for peacefulness. Accordingly, defendant's second argument is overruled.

**[4]** Defendant next argues that the trial court erred in instructing the jury. At the close of all the evidence, the trial court provided the following pertinent instructions to the jury:

> Malice may be inferred from evidence that the victim's death was done by an attack by hand alone without the use of other weapons, where the attack was made by a mature man upon a defenseless infant.

Defendant asserts that the trial court improperly instructed the jury regarding malice because "unequivocal evidence of severe beating" is necessary for such an instruction. We disagree.

Contrary to defendant's assertion, there is no requirement in our case law that evidence of a "severe beating" exist in order for the trial court to provide a malice-inference instruction. Instead, our Supreme Court has held that "malice may be inferred from the 'willful blow by an adult on the head of an infant.' " *State v. Elliott*, 344 N.C. 242, 268, 475 S.E.2d 202, 213 (1996) (quoting *State v. Perdue*, 320 N.C. 51, 58, 357 S.E.2d 345, 350 (1987)), *cert. denied*, 520 U.S. 1106, 137 L. Ed. 2d 312 (1997). Similarly, in *State v. Huggins*, where the defendant argued that in order to find malice, "there must have been a sustained attack or pattern of abuse," this Court rejected the defendant's argument and held that, while a finding of malice may be supported by evidence of a sustained attack of short duration or sustained abuse that proximately causes a child's death, case law has not "establish[ed] a minimum standard by which malice must be judged." 71 N.C. App. 63, 67-68, 321 S.E.2d 584, 587 (1984), *disc. review denied*, 313 N.C. 333, 327 S.E.2d 895 (1985). Therefore, while malice is not necessarily inferred where death results from an attack upon a strong or mature person, malice may be inferred where death results from an attack made by a strong person and inflicted upon a young child, because "[s]uch an attack is reasonably likely to result in death or serious bodily injury" to the child. *Elliot*, 344 N.C. at 269, 475 S.E.2d at 213.

> Whether an attack made with hands or feet alone which proximately causes death gives rise to either a presumption of malice as a matter of law or to an inference of malice as a matter of fact will depend upon the facts of the particular case. For example, if an assault were committed upon an infant of tender years or upon a person suffering an apparent disability which would make the assault likely to endanger life, the jury could, upon proper instructions by the trial court, find that the defendant's hands or feet were used as deadly weapons. Nothing else appearing, the trial court properly could instruct the jury that, should they find the defendant used his hands or feet as deadly weapons and intentionally inflicted a wound upon the deceased proximately causing his death, the law presumes that the killing was unlawful and done with malice. *See State v. West*, 51 N.C. 505 (1859); *State v. Sallie*, 13 N.C. App. 499, 186 S.E.2d 667, *cert. denied*, 281 N.C. 316, 188 S.E.2d 900 (1972) and cases cited therein. *See generally* Annot. 22 A.L.R. 2d 854 (1952).

*State v. Lang*, 309 N.C. 512, 525-26, 308 S.E.2d 317, 324 (1983).

In the instant case, defendant was a twenty-eight-year-old male, and Brian was a three-year-old child who was suffering from a broken collarbone. Evidence introduced at trial tended to show that Brian received multiple traumatic blows to the head, which were intentionally inflicted while Brian was in defendant's care. We conclude that this evidence is sufficient to support the trial court's instruction, and accordingly, we overrule defendant's third argument.

[5] In two motions for appropriate relief filed with his appeal, defendant argues that the trial court erred by sentencing him in the aggravated range. Defendant asserts that the trial court was prohibited from sentencing him in the aggravated range because the aggravating factors were not submitted to the jury. We agree.

Our Supreme Court has recently examined the constitutionality of this state's structured sentencing scheme in light of the United States Supreme Court's decisions in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435 (2000) and *Blakely v. Washington*, 542 U.S. 296, 159 L. Ed. 2d 403 (2004). *State v. Allen*, 359 N.C. 425, 359 S.E.2d 437 (2005). In *Allen*, the Court concluded that, when "[a]pplied to North Carolina's structured sentencing scheme, the rule of *Apprendi* and *Blakely* is: Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed presumptive range must be submitted to a jury and proved beyond a reasonable doubt." 359 N.C. at 437, —— S.E.2d at —— (citing *Blakely*, 542 U.S. at ——, 159 L. Ed. 2d at 413-14; *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455; N.C. Gen. Stat. §§ 15A-1340.13, 15A-1340.14, 15A-1340.16, 15A-1340.17).

In the instant case, following defendant's conviction for second-degree murder, the trial court found as aggravating factors: (i) that the victim of the crime was very young; (ii) that defendant took advantage of a position of trust or confidence to commit the offense; and (iii) that defendant was absent without leave from the United States Army at the time of the offense. The trial court found these factors unilaterally, failing to submit the factors to the jury for proof beyond a reasonable doubt. The State argues that the trial court's errors were harmless and do not require reversal under the circumstances. However, in *Allen*, the Court rejected application of the harmless error doctrine to such sentencing errors, noting that "[b]ecause 'speculat[ion] on what juries would have done if they had been asked to find different facts' is impermissible, the Washington Supreme Court concluded, as do we, that '[h]armless error analysis cannot be conducted on *Blakely* Sixth Amendment violations.' " 359

IN RE J.B.

[172 N.C. App. 747 (2005)]

N.C. at 448, —— S.E.2d at —— (quoting *State v. Hughes,* 154 Wash. 2d 118, 148, 110 P.3d 192, 208 (2005)). Thus, in light of our Supreme Court's decision in *Allen,* we conclude that the trial court committed reversible error by sentencing defendant in the aggravated range.[2] Therefore, we remand the case for resentencing.

No error at trial; remanded for resentencing.

Judges TYSON and GEER concur.

---

2. In his second motion for appropriate relief, defendant asserts that the trial court was prohibited from sentencing him in the aggravated range because the State failed to allege the pertinent aggravating factors in the indictment. However, our Supreme Court expressly rejected the same assertion by the defendant in *Allen.* 359 N.C. at 438, —— S.E.2d at —— (overruling language in *State v. Lucas,* 353 N.C. 568, 548 S.E.2d 712 (2001), "requiring sentencing factors which might lead to a sentencing enhancement to be alleged in an indictment[,]" finding no error in the State's failure to include aggravating factors in the defendant's indictment, and noting that in *State v. Hunt,* "[T]his Court concluded that 'the Fifth Amendment would not require aggravators, even if they were fundamental equivalents of elements of an offense, to be pled in a state-court indictment.' " (quoting *State v. Hunt,* 357 N.C. 257, 272, 582 S.E.2d 593, 603, *cert. denied,* 539 U.S. 985, 156 L. Ed. 2d 702 (2003)). Accordingly, defendant's assertion in the instant case is overruled as well.