[Cite as *Yurkowski v. Univ. of Cincinnati*, 2011-Ohio-5982.]



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

SHARON YURKOWSKI, Admr., etc., et al.,          Case No. 2007-04311

    Plaintiffs,

    v.          Judge Alan C. Travis

UNIVERSITY OF CINCINNATI,

    Defendant.          <u>DECISION</u>


{¶1} Plaintiff[1] brings this action for wrongful death against defendant on behalf of herself and the heirs of decedent, Peter Yurkowski. The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶2} Plaintiff's decedent, Peter Yurkowski, was married to plaintiff in 1985, and the couple had two children, Cara and Danny. Yurkowski suffered from major depression with suicidal ideation for much of his adult life. He made his first attempt at suicide when he was just 18 years old. He was able to recover from that episode and he eventually graduated from college and later attended graduate school at the University of Cincinnati (UC). Yurkowski met plaintiff at UC and he earned a degree from the college of pharmacology.

{¶3} In 1992, Yurkowski took a position with University Hospital (UH) as a clinical pharmacist. He excelled in his position and, as a result of his expertise, he was invited to lecture throughout the country on subjects related to pharmacology. During that time, he also served as a youth football coach and he was involved in other activities in his community.

---

[1]As used herein, "plaintiff" shall refer to Sharon Yurkowski.

{¶4} Yurkowski's mental health issues resurfaced in 2000, when he became extremely anxious and he began to suffer from psychosomatic illnesses that prevented him from traveling. He eventually presented to the UH emergency room with symptoms of severe depression and he was subsequently admitted to Christ Hospital for inpatient treatment in September 2000, and then again in December 2000.

{¶5} James S. Curell, M.D., began treating Yurkowski when Yurkowski was transferred from Christ Hospital to UH in 2000.[2] Dr. Curell knew Yurkowski professionally through Yurkowski's employment as a clinical pharmacist at UH and he was aware that Yurkowski had been admitted to Christ Hospital with a diagnosis of "major depression." Over the next several years, Yurkowski was admitted to the UH psychiatric unit on ten separate occasions for mental health treatment. He continued to be employed by UH as a pharmacist during this time. During the last six months of his life, Yurkowski was hospitalized a total of 85 days.

{¶6} Yurkowski's last hospitalization ended March 22, 2005, when he was discharged by Dr. Curell. Dr. Curell continued to see Yurkowski on an outpatient basis following his discharge. The outpatient progress notes contained in the medical records state that Dr. Curell had three outpatient sessions with Yurkowski after his discharge, the last one being April 13, 2005. In his notes from the April 4, 2005 session, Dr. Curell noted that Yurkowski "does remain at risk." Yurkowski took his own life on April 18, 2005, with an overdose of drugs.

{¶7} In the complaint, plaintiff alleges that Dr. Curell failed to properly diagnose Yurkowski's condition; that his personal and working relationship with Yurkowski improperly influenced his independent professional judgment; and that Dr. Curell prematurely discharged Yurkowski from UH on March 22, 2005. According to plaintiff, these instances of malpractice were the proximate cause of Yurkowski's death.

{¶8} "To maintain a wrongful death action on a theory of negligence, a plaintiff must show (1) the existence of a duty owing to plaintiff's decedent, (2) a breach of that duty, and (3) proximate causation between the breach of duty and the death." *Littleton*

---

[2]Following an evidentiary hearing, the court determined that Dr. Curell is entitled to civil immunity pursuant to R.C. 2743.02(F) and 9.86.

*v. Good Samaritan Hosp. & Health Ctr.* (1988), 39 Ohio St.3d 86, 92, citing *Bennison v. Stillpass Transit Co.* (1966), 5 Ohio St.2d 122.

{¶9} "In order to establish medical malpractice, it must be shown by a preponderance of evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances * * *." *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, paragraph one of the syllabus.

{¶10} As a general rule, "[a] psychiatrist, as a medical specialist, is held to the standard of care 'of a reasonable specialist practicing medicine or surgery in that same specialty in the light of present day scientific knowledge in that specialty field * * *.'" *Littleton,* supra, at 93, quoting *Bruni*, supra, at paragraph two of the syllabus. However, in *Littleton*, supra, the court recognized the difficulty in strictly applying such a standard in cases involving the discharge of a patient. Therein the court determined that "a psychiatrist will not be held liable for the violent acts of a voluntarily hospitalized mental patient subsequent to the patient's discharge if (1) the patient did not manifest violent propensities while being hospitalized and there was no reason to suspect the patient would become violent after discharge, or (2) a thorough evaluation of the patient's propensity for violence was conducted, taking into account all relevant factors, and a good faith decision was made by the psychiatrist that the patient had no violent propensity, or (3) the patient was diagnosed as having violent propensities and, after a thorough evaluation of the severity of the propensities and a balancing of the patient's interests and the interests of potential victims, a treatment plan was formulated in good faith which included discharge of the patient." Id. at 99.

{¶11} Defendant contends that all medical claims alleging an improper discharge of a psychiatric patient are governed by the "professional judgment rule" in *Littleton*, supra. Plaintiff attempts to distinguish *Littleton* from the present case on the basis that *Littleton* involved an injury to a third-party, not suicide. However, in a subsequent decision of the Tenth District Court of Appeals, the "professional judgment rule" was

applied in a case of suicide. *Brooks v. Ohio Dept. of Mental Health* (Nov. 14, 1995), 10th Dist. No. 95API04-505.

{¶12} In *Brooks*, supra, the court explained: "While the test in *Bruni* is proper in a medical negligence case, the court in *Littleton* * * * recognized that, because of the unpredictability and uncertainty as to patients' actions upon release from a psychiatric facility, holding psychiatrists to the malpractice standard of ordinary care is too stringent." Id. The court adopted the "professional judgment rule," whereby a psychiatrist could not be held liable for releasing a patient who subsequently harms himself if the psychiatrist makes a "good faith judgment based on a thorough evaluation of all relevant factors." Id. (Citations omitted.)

{¶13} Thus, with respect to plaintiff's claim that Yurkowski was prematurely discharged, the court will apply the professional judgment rule. Dr. Curell had treated Yurkowski's symptoms of major depression in the four years prior to Yurkowski's death. The treatment included the use of numerous anti-anxiety and antidepressant drugs, group and individual psychotherapy sessions, electroconvulsive therapy (ECT), and a total of ten hospitalizations both voluntary and involuntary. However, in order for the court to review Dr. Curell's decision to discharge Yurkowski on March 22, 2005 in the proper context, the court will review the history of Dr. Curell's treatment of Yurkowski in the years prior to Yurkowski's death.

{¶14} In January 2001, Dr. Curell admitted Yurkowski to the UH inpatient psychiatric unit for treatment of his depression. Following inpatient treatment, Yurkowski was discharged from UH on January 16, 2001, with a diagnosis of major depression, severe and recurring with a differential diagnosis of possible bipolar disorder.

{¶15} Following Yurkowski's discharge, Dr. Curell began to provide Yurkowski with individual psychotherapy on an outpatient basis. During his sessions with Dr. Curell, Yurkowski complained to him that the medications prescribed by the physicians at Christ Hospital made him groggy and unable to function at work. Dr. Curell prescribed an anti-depressant, Serzone, and the anti-anxiety drug, Klonopin. He also counseled Yurkowski to simplify his life to allow himself more free time. Yurkowski continued to take the prescribed medications and he gave up lecturing to focus on clinical

pharmacology. Dr. Curell testified that as a result of the medication and lifestyle changes Yurkowski was able to "return to normal function."

{¶16} A little more than four years later, on June 16, 2004, Yurkowski was taken to the UH emergency room and subsequently admitted to the psychiatric unit following a failed suicide attempt. Plaintiff had found her husband lying on the garage floor with the car running and a hose leading from the tail pipe to his face.

{¶17} Upon admission, Yurkowski was diagnosed with major depression, severe and recurring; psychosis and bipolar disorder were ruled out at that time. It was noted in his admission records that administrative duties had recently been added to his workload at UH which reportedly caused added stress. Dr. Curell's assessment and treatment plan included such medications as the anti-depressant, Effexor, both Ativan and Klonopin for anxiety, Ambien for sleep, and both group and individual psychotherapy. It was later determined that Yurkowski did not respond well to group therapy and that course of treatment was abandoned.

{¶18} Yurkowski did not experience the type of recovery he had enjoyed following the 2001 hospitalization. In fact, a few months later, Yurkowski was readmitted for two days of inpatient treatment. Yurkowski was back at the UH psychiatric unit again on October 4, 2004, after taking an overdose of Klonopin. Dr. Curell diagnosed major depression, severe and recurring and he identified both Yurkowski's employment and family issues as major stressors in Yurkowski's life. Yurkowski was placed on suicide precautions upon admission.

{¶19} After a few days of inpatient treatment, Yurkowski reported an improvement in his mood. Dr. Curell was skeptical about Yurkowski's reported improvement as he felt that Yurkowski's subjective assessment was at odds with the objective evidence. It was noted that Yurkowski was not taking his Effexor on a regular basis due to complaints of sleeplessness and that he had developed an obsessive-compulsive disorder. Yurkowski was released from UH on October 7, 2004, after promising Dr. Curell he would alter his work duties and take his prescribed medication. During the course of Yurkowski's treatment, Dr. Curell was in contact with Yurkowski's supervisor in an effort to decrease work-related stress.

{¶20} On November 16, 2004, Yurkowski attempted to take his life by carbon monoxide poisoning. Upon his admission to UH, Yurkowski was tearful and expressed thoughts of suicide either by drug overdose or carbon monoxide poisoning. The diagnosis remained major depression, severe and recurring. Dr. Curell noted that Yurkowski had difficulty regulating his sense of self-esteem and that his job and family continued to be major stressors in his life. He was discharged on November 17, 2004.

{¶21} Dr. Curell subsequently added Cymbalta to Yurkowski's medication regimen on December 10, 2004, in order to augment existing pharmacological treatment of depression. However, Yurkowski was back in the UH psychiatric unit on December 12, 2004, complaining of depression, with suicidal ideation and recurring crying spells. Yurkowski told Dr. Curell that he believed the Cymbalta was the source of his depressed mood and Dr. Curell advised Yurkowski to discontinue the medication. During his five-day stay at UH, Yurkowski continued to suffer crying spells, he was uncooperative with staff and attempted to escape. When Yurkowski was discharged on December 17, 2004, he was still considered a suicide risk.

{¶22} Only two days passed before Yurkowski again found himself in the UH psychiatric unit. Dr. Curell's December 20, 2004 admission note contains observations of inergea, anhedonia, and issues with work and family. During his 23-day stay at UH, in addition to medication and psychotherapy, Yurkowski underwent a course of seven ECT sessions, all in an effort to treat his seemingly intractable depression.

{¶23} A resident's note dated January 8, 2005, mentions that Yurkowski was agitated over missing work and he remained suicidal, but that he had contracted for safety, which means that he agreed to seek help before attempting suicide. Two days later Yurkowski reported that his level of depression was at a five on a ten point scale and that he wished to be discharged. Yurkowski was discharged the next day after reporting his depression had decreased to 3 out of 10 and denying any suicidal ideation. Yurkowski's discharge summary was completed by Dr. Dressler who noted that Yurkowski was "not acutely suicidal."

{¶24} Yurkowski was again admitted to the UH psychiatric unit on January 22, 2005, after ingesting a combination of drugs in yet another failed attempt at suicide. Yurkowski required several days of medical detoxification on this occasion before being

transferred to the psychiatric unit. At this stage, Dr. Curell's level of concern for Yurkowski's safety was heightened and he elected to seek an order of involuntary commitment to a residential psychiatric facility. Yurkowski was subsequently placed on a 72-hour hold based on Dr. Curell's representation to the probate court that Yurkowski was a danger to himself and in need of hospitalization.

{¶25} A January 26, 2005 progress note indicates that Yurkowski felt better than ever and that his employer had agreed to let him work on a part-time basis to relieve his stress. Yurkowski was released the next day. However, when Yurkowski returned to UH on January 31, 2005, Dr. Curell called upon Dr. Paul Keck for a second opinion regarding a course of treatment. Dr. Keck subsequently reviewed Yurkowski's mental health file and conducted a personal one-hour session with Yurkowski after which he issued a one-page summary of his findings and recommendation. Dr. Keck concurred with Dr. Curell's diagnosis of major depression, severe and recurring, and he agreed with Dr. Curell's decision to rule out bipolar 2 disorder. Although Dr. Keck recommended that Dr. Curell alter some of Yurkowski's medications, he did not recommend that Yurkowski be confined to an inpatient facility pursuant to an involuntary commitment. Yurkowski was subsequently discharged from UH on February 5, 2005.

{¶26} The very next day, Yurkowski was brought back to the UH emergency room after taking an overdose of lithium during a panic attack. In the course of a two-day medical detoxification, Yurkowski left the emergency room without permission and he was subsequently discovered back at the UH pharmacy. He was immediately taken to the psychiatric unit for what was to be his last admission. Upon admission, Dr. Curell discontinued the lithium trial, started Yurkowski on Parnate, a mood-stabilizing drug, restricted Yurkowski to his unit and once again initiated the process of involuntary commitment.

{¶27} By February 11, 2005, Yurkowski was extremely depressed, "non-compliant with conversation," and suicidal. On February 18, 2005, Yurkowski related that plaintiff had decided to divorce him and that he would not be permitted to return home upon his release. Dr. Curell authorized Yurkowski to leave the facility on February 25, 2005, so that he could secure a place to live upon his release. When Yurkowski returned to UH he reported that "he was able to find an apartment."

{¶28} On March 2, 2005, Yurkowski was served with divorce papers and by March 4, 2005, had "de-compensated" to the point where Dr. Curell believed he was acutely dangerous to himself. Dr. Curell ordered that Yurkowski be placed in restraints and he added a beta blocker to Yurkowski's medication with the hope of preventing another panic attack. At this juncture, Dr. Curell was convinced that Yurkowski needed to be transferred to Summit Behavioral Health Center (Summit); that he would not be released to his new apartment. The progress notes are replete with entries such as: "will go to Summit when bed available" which is noted on March 7, 2005, March 10, 2005, March 11, 2005, and March 13, 2005; and "awaiting evaluation and approval of transfer," which is noted on March 14, 2005, March 15, 2005, and March 17, 2005. However, by March 18, 2005, the records suggest that Dr. Currell was observing improvements in Yurkowski's condition that caused him to reconsider an involuntary commitment and to ultimately release Yurkowski on March 22, 2005. It is this decision that plaintiff believes was the critical error which led to Yurkowski's death.

{¶29} Plaintiff relies on the expert testimony of Robert P. Granacher, M.D., in support of the wrongful death claim. Dr. Granacher holds a medical degree from the University of Kentucky and he is licensed to practice medicine and psychiatry in Ohio. He is currently self-employed at Saint Joseph's Health Care Systems. Dr. Granacher admitted that approximately 40% of his professional time is devoted to his work as an expert medical consultant and witness and that his income from expert consulting services far exceeds his clinical income. Dr. Granacher expressed numerous criticisms of Dr. Curell's treatment of Yurkowski, most of which had little to do with the ultimate outcome of this case. Indeed, while Dr. Granacher delineated nine separate criticisms, the court will focus on his criticism of Dr. Curell's decision to release Yurkowski on March 22, 2005.

{¶30} Dr. Granacher testified that the standard of care in such a case is for the psychiatrist to perform a suicide risk assessment and to memorialize such assessment in a document which becomes part of the patient's medical record. Dr. Granacher opined that Dr. Curell either failed to perform a suicide risk assessment or failed to adequately document such assessment prior to discharging Yurkowski from UH on March 22, 2005. Dr. Granacher further opined that had Dr. Curell performed a suicide

risk assessment, Yurkowski would not have been discharged on March 22, 2005, and would not have committed suicide on April 18, 2005.

{¶31} "[A]n involuntary civil commitment of an individual constitutes a significant deprivation of liberty * * *." *In re Miller* (1992), 63 Ohio St.3d 99, 101, citing *Addington v. Texas* (1979), 441 U.S. 418, 425; *In re Burton* (1984), 11 Ohio St.3d 147, 151. Nevertheless, under R.C. 5122.01(B) a "[m]entally ill person subject to hospitalization by court order" means a mentally ill person who, because of the person's illness: "(1) Represents a substantial risk of physical harm to self as manifested by evidence of threats of, or attempts at, suicide or serious self-inflicted bodily harm * * *."

{¶32} In *Littleton*, supra, the Ohio Supreme Court explained the concept of "'good faith, independence and thoroughness' as it relates to a psychotherapist's decision not to commit a patient. * * * Factors in reviewing such good faith include the competence and training of the reviewing psychotherapists, whether the relevant documents and evidence were adequately, promptly and independently reviewed, whether the advice or opinion of another therapist was obtained, whether the evaluation was made in light of the proper legal standards for commitment, and whether other evidence of good faith exists." Id. at 96, quoting *Currie v. United States* (M.D.N.C. 1986), 644 F. Supp. 1074, 1083.

{¶33} Dr. Curell is an Associate Professor of Clinical Psychiatry at the UC College of Medicine, and he is an attending physician on the inpatient adult psychiatric unit at UH. He is board certified in adult psychiatry. He is also employed by a private medical provider known as Professional Psychological Services Incorporated (PPSI) and he has an ownership interest in PPSI. Based upon Dr. Curell's credentials including his clinical experience with suicidal patients, the court finds that he is both a competent and well-trained psychiatrist.

{¶34} The evidence establishes that Yurkowski's relative risk of suicide was assessed by Dr. Curell in consultation with Yurkowski's other mental health providers and practitioners on a daily basis during his final admission to the UH psychiatric unit. The medical records from Yurkowski's last admission are replete with reference to Yurkowski's varying degrees of suicidal ideation. Indeed, the notation "plans to commit suicide when he leaves the hospital" appears in the records on February 19, 2005,

"acutely dangerous" on March 4, 2005, "denies suicidal ideation" on March 7, 2005, and "no acute suicidal ideation" on March 17, 2005.

{¶35} Dr. Granacher believed, however, that a proper suicide risk assessment requires the psychiatrist to expressly address a number of specific risk factors and to weigh such factors against the benefits the patient will realize as a result of a discharge. Dr. Granacher's review of Yurkowski's medical records did not reveal any specific document memorializing a suicide risk assessment on any of the ten instances in which Yurkowski was admitted with suicidal ideation, including his final admission on February 8, 2005. With regard to Yurkowski's final discharge on March 22, 2005, Dr. Granacher surmised from the absence of such a document that a suicide risk assessment was not performed. He then concluded that Dr. Curell breached the standard of care when he released Yurkowski to his apartment on March 22, 2005. He further opined that such failure was the proximate cause of Yurkowski's suicide on April 18, 2005.

{¶36} Defendant's expert, Mark Schecter, M.D., is board certified in adult psychiatry. He is the Chairman of the Department of Psychiatry at North Shore Medical Center in Salem, Massachusetts, and an instructor of psychiatry, including a course in suicide risk assessment, at Harvard Medical School. Dr. Schecter is a member of a professional association known as the Boston Suicide Study Group and he has authored or co-authored published articles regarding suicide risk assessment and the treatment of suicidal patients.

{¶37} According to Dr. Schecter, there is no checklist or equation that must be used in performing a suicide risk assessment and such an assessment need not be memorialized in a single document or record. Rather, a proper assessment requires the clinician to consider both objective and subjective factors; that available measurable data must be considered along with the cognitive and experiential. In his review of the medical records of Yurkowski's final hospitalization, Dr. Schecter found evidence that a suicide risk assessment was being performed on a daily and continuing basis, and he opined that Dr. Curell complied with the standard of care in performing a suicide risk assessment of Yurkowski during his final UH admission in March 2005.

{¶38} Dr. Curell acknowledged that he could have done a more thorough job of documenting each of the suicide risk assessments he performed. However, even Dr.

Granacher acknowledged that a failure of proper documentation is rarely the responsible cause of the death of a psychiatric patient; rather, it is an indicia of the quality of care. In this instance, given the fact that Dr. Curell saw Yurkowski on a daily basis throughout his final admission, including the day of his discharge, the court is persuaded that the lack of documentation was not a substantial factor in the outcome.

{¶39} Dr. Curell testified that after weighing all the relevant factors, and in light of Yurkowski's recent improvement, he decided to give Yurkowski one more chance to make it on his own in the community before confining him to an institution. In Dr. Curell's opinion, committing Yurkowski at that point in time would have been so devastating to his self- esteem that he would have never recovered. He testified that it was one of the most difficult decisions he has ever had to make in his professional career and that even after making the decision he remained "wary" of discharging Yurkowski. Indeed, the court finds that Dr. Curell's statement to Yurkowski that he was "sticking his neck out" by discharging him, evidences the degree of difficulty involved in the decision rather than the degree of fault as plaintiff now contends.

{¶40} Moreover, in determining defendant's potential liability for Yurkowski's suicide, the question is not whether, in hindsight, Dr. Curell's discharge decision was correct. The legal standard requires the court to determine whether Dr. Curell exercised his professional judgment in good faith when he decided to release Yurkowski to his apartment. Indeed, "[w]ithin the broad range of reasonable practice and treatment in which professional opinion and judgment may differ, the therapist is free to exercise his or her own best judgment without liability; proof, aided by hindsight, that he or she judged wrongly is insufficient to establish negligence." *Estates of Morgan v. Fairfield Family Counseling Ctr.,* 77 Ohio St.3d 284, 306, 1997-Ohio-194, quoting *Tarasoff v. Regents of Univ. of California* (1976), 17 Cal.3d 425, 438.

{¶41} On cross-examination, Dr. Granacher acknowledged that involuntary commitment of a patient has drawbacks such as the loss of the ability to work, and the social stigma that attaches to such a patient. He also agreed that suicide risk assessment is one of the more difficult tasks facing a clinical psychiatrist and that suicide cannot be predicted with certainty.

{¶42} Dr. Schecter conceded that only two or three percent of suicides occur in a hospital setting, and that Yurkowski likely would not have committed suicide on April 18, 2005, had he been sent to Summit on March 22, 2005. However, Dr. Schecter also testified that there is no evidence that long term hospitalization prevents suicide.

{¶43} It is of some significance to the court that Yurkowski did not commit suicide immediately after his release on March 22, 2005, or even within a few days thereafter. As noted above, there were a number of occasions when Yurkowski returned to UH just days or hours after being discharged, either after having attempted suicide or having manifested intentions of doing so. In this instance, after being discharged on March 22, 2005, Yurkowski attended four scheduled outpatient sessions with Dr. Curell. The evidence also shows that Yurkowski had dinner with family on the night of April 17, 2005, and that he was observed jogging in the neighborhood just hours prior to his suicide.

{¶44} The evidence establishes that Dr. Curell is a well educated, competent psychiatrist, that he had significant experience in the treatment of suicidal patients, that he promptly and independently reviewed all relevant documents regarding Yurkowski's case, that he sought the advice or opinion of another psychiatrist, and that he understood the legal standards for commitment in Ohio. In the final analysis, the weight of evidence convinces the court that Dr. Curell did, in fact, exercise his professional judgment in good faith when he elected to discharge Yurkowski on March 22, 2005.

{¶45} Dr. Granacher suggested Dr. Curell's professional judgment was influenced by the impermissible boundary violation with Yurkowski. He explained that where a psychiatrist and his patient develop a close relationship, the independent professional judgment and decision making of the psychiatrist is affected. Plaintiff relies upon the fact that Yurkowski was first admitted to UH under a pseudonym in 2000, and the fact that Yurkowski and Dr. Curell worked for the same employer as proof of a boundary violation.

{¶46} The court does not believe that Dr. Curell's professional judgment was influenced by the fact that Yurkowski was employed by UH. Rather, the court finds that Yurkowski's knowledge of, and experience with the mental health system, enabled him to say and do whatever was necessary to secure his release from the hospital and that

he may have been able to achieve such a result even though it may not have been in his own best interest. Dr. Curell testified that he was aware of Yurkowski's tendency to minimize his complaints and exaggerate his improvement when he wished to be released, and that Dr. Currell took this fact into consideration when making professional judgment. The medical records corroborate Dr. Curell's testimony. Thus, the court does not believe Dr. Curell's professional judgment was impacted by an impermissible boundary violation.

{¶47} Turning to Dr. Granacher's other criticisms of Dr. Curell, it was Dr. Granacher's belief that Yurkowski's condition was misdiagnosed; that Yurkowski suffered from bipolar disorder type 2. However, Dr. Schecter stated that his review of Yurkowski's records did not reveal any deviation from the standard of care in the diagnosis of his mental illness. Moreover, Dr. Keck, who Dr. Granacher referred to as an expert in the research of bipolar disorder, agreed with Dr. Curell's assessment that Yurkowski did not suffer from bipolar disorder.

{¶48} Dr. Granacher also criticized Dr. Curell for allowing Yurkowski to return to work at the UH pharmacy where he would have access to dangerous drugs. However, as is evident from the medical records and the other expert testimony, Yurkowski became agitated when he was not permitted to work and the court is persuaded by Dr. Curell's testimony that the best course of treatment was to negotiate work accommodations that would reduce his stress rather than to prohibit him from working. Based upon the evidence, the court finds that Dr. Curell met the standard of care regarding this aspect of Yurkowski's treatment.

{¶49} Dr. Granacher was also critical of Dr. Curell's decision to prescribe medication in quantities which would permit Yurkowski to commit suicide by intentional overdose. Although the evidence establishes that several of Yurkowski's suicide attempts were by way of his own prescribed medication, either alone or in combination with over-the-counter medications and/or carbon monoxide poisoning, the court is not persuaded that Dr. Curell violated the standard of care in regard to Yurkowski's medication. Indeed, in Dr. Schecter's opinion, the option of requiring Yurkowski to return to Dr. Curell's office on a daily basis to obtain medication was impractical under the circumstances and unlikely to achieve the desired result.

{¶50} In the final analysis, the court finds that the testimony of Dr. Curell and Dr. Schecter was much more persuasive than that of Dr. Granacher. Both Drs. Curell and Schecter spend a great deal more time in the clinical practice of psychiatry and psychopharmacology than Dr. Granacher. Additionally, the court notes that portions of Dr. Granacher's testimony simply do not comport with the evidence in this case.

{¶51} For example, Dr. Granacher claimed that ECT is not an effective treatment for bipolar disorder, a claim that Dr. Schecter strongly disagreed with and which Dr. Curell characterized as "patently false." Dr. Granacher also criticized Dr. Curell for admitting Yurkowski to UH under a pseudonym in 2000, when the evidence established that Dr. Curell had nothing to do with such a decision. Dr. Granacher also faulted Dr. Curell for not noting Yurkowski's failure to comply with his lithium prescription during his January 22, 2005 admission where the evidence establishes that lithium had not been prescribed. In short, the testimony of Dr. Granacher was not particularly persuasive in this matter.

{¶52} Moreover, even if the court were to agree with each of the complaints levied against Dr. Curell by Dr. Granacher, the evidence does not support a finding that the suggested alternative would have made any difference in the outcome. For example, Dr. Granacher could not say that the diagnosis and treatment plan he recommended would have either cured Yurkowski of his depression and suicidal ideation or prevented his suicide. Yurkowski suffered from severe, recurring depression which proved to be resistant to medication, psychotherapy, and ECT. Plaintiff has not proven by the greater weight of the evidence either that Dr. Curell failed to exercise his professional judgment, in good faith, when he discharged Yurkowski from UH on March 22, 2005, or that Dr. Curell's treatment of Yurkowski's mental illness in the weeks and months prior to his suicide failed to meet the generally accepted standard of care. Plaintiff also failed to show that any failure of due care on the part of Dr. Curell was the proximate cause of Yurkowski's death by suicide on April 18, 2005. Accordingly, judgment shall be rendered in favor of defendant.



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

SHARON YURKOWSKI, Admr., etc., et al.,    Case No. 2007-04311

    Plaintiffs,

    v.                    Judge Alan C. Travis

UNIVERSITY OF CINCINNATI,

    Defendant.           JUDGMENT ENTRY

{¶53} This case was tried to the court on the issue of liability. The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of defendant. Court costs are assessed against plaintiffs. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

_____
ALAN C. TRAVIS
Judge

cc:

Anne B. Strait
Assistant Attorney General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

Mitchell W. Allen
5947 Deerfield Blvd., Suite 201
Mason, Ohio 45040-2540

Filed October 6, 2011
To S.C. reporter November 18, 2011